## MID-KANSAS OIL & GAS CO. v. STATE INDUSTRIAL 'COMMISSION et al.

No. 23664. Dec. 19, 1933.

A. M. Gee and H. G. Ross, for petitioner.

Johnson & Jones, for respondent.

McNEILL, J. This action involves an award by the State Industrial Commission in favor of respondent, Ralph Chestnut, and against the Mid-Kansas Oil & Gas Company, a corporation, petitioner.

It appears that respondent, on May 28, 1931, while working as an oil field roustabout for petitioner, sustained an accidental personal injury. A piece of steel from a' wire rod-line became imbedded in the eye of respondent. The attending physician describes the nature and extent of the injury and treatment in his report filed with the Industrial Commission June 3, 1931, as follows: "Small piece of steel imbedded in margin of cornea of right eye at 3 o'clock position"; and that the treatment was "removal under local anaesthetic." It appears that respondent did not receive medical treatment until the day following the accident.

Dr. Reynolds treated respondent about five times, and shortly thereafter respondent was sent to Doctors White and White, eye specialists, in the city of Tulsa, for treatment. These doctors gave him treatments on 32 different occasions during the months of June and July, 1931.

On June 22, 1931, petitioners filed with the State Industrial Commission report of initial payment of compensation, showing that the compensation was started on June 7, 1931, and that the amount of the first payment of $30.78 was from June 7. 1931, to June 20, 1931, inclusive. This report stated that the nature of the injury was "small piece of steel imbedded in margin of cornea of right eye."

On July 3. 1931, respondent filed with the Commission employee's first notice of injury and claim for compensation. On July 11, 1931, employer's supplemental report of injury was filed showing that respondent had returned to work on July 8, 1931. at the same wage. Thereafter, on August 28, 1931, respondent filed with the Commission a motion for hearing to determine the extent of permanent disability, setting forth in said motion that said injury had resulted in a permanent disability to respondent in that he had sustained an 80 per cent. loss of vision in right eye and 30 per cent. loss of vision in the left eye.

The matter was set down for hearing, and after several continuances and ex-

aminations by medical experts, the Commission, on April 21, 1932, found that respondent had sustained a permanent total disability to his right eye by reason of the injury sustained on May 28, 1931. The Commission directed petitioner to pay respondent 100 weeks' compensation for such disability. Petitioners seek to review this order and award.

Petitioners present four propositions:

"1. That there is no evidence to support the findings made by the Commission.

"2. That in an action for personal injury, the injury complained of is of such character as to require skilled or professional men to determine the cause and effect thereof, the question is one of science and must necessarily be proved by skilled and professional persons."

Under the second proposition it is the contention of petitioners that the testimony offered by respondent had no probative value and was incompetent.

"3. Where, in a proceeding before the State Industrial Commission, the evidence of the medical or expert witnesses is such as to show that the disability of claimant is due in part to an accidental injury and part to pre-existing disease, a finding of the Commission that the disability is due wholly to the accidental injury is error.

"4. Where the uncontradicted evidence shows that an award of the State Industrial Commission is excessive and there is no other error, this court, on review will order the award reduced to conform to the evidence."

Respondent testified that he had never been examined for glasses and that after he had been discharged by Doctors White and White July 27, 1931, he could not see as well as prior to the injury. It does not seem to be disputed that at the time of the hearing there was approximately an 85 per cent. loss of vision to the right eye.

Dr. J. E. Hollis, an eye, ear, nose and throat specialist, testified that he first examined respondent August 4, 1931, and at that time he discovered a scar on the cornea. In answer to a hypothetical question as to what caused the resulting loss of vision in respondent's eye based upon what he found and the history of the case, he testified as follows:

"I believed it to be that; I think it was from the nature and location of the injury. Q. Now, just elaborate on that, Doctor, if you will, you say by reason of the nature and location of the injury? A. Well, he gives a history there of having been treated for something like 60 days, that would lead me to believe that the injury was more than a minor injury which should have cleared up in 5 or 6 days, then the location of the injury which is on the uveal tract which is considered the danger area of the eye, and the part of the eye which very often causes sympathetic trouble with the other eye; that's my opinion."

In testifying in reference to the scar on the cornea, as to whether the piece of steel had penetrated the eyeball, Dr. Hollis testified as follows:

"Q. What is your opinion as to whether or not it did penetrate the eyeball? A. Well, from the character of the scar, it would lead me to believe it did. Q. You don't know that it did? A. No, sir. Q. There was no evidence at the time you examined him that his eye was penetrated deep, was there? A. Well, there was evidence that it was deep, for it had to be to produce the scar it did."

Dr. E. W. Reynolds, who first attended respondent, giving him treatment on four or five different occasions, testified that he treated the eye of respondent to prevent an ulcer from forming on the cornea, and that at the last time he treated respondent an ulcer was present. He also testified as follows:

"Q. I'll ask you whether or not, in your opinion, it would be possible for the ulcer to become aggravated to the extent it might have penetrated the surface of the cornea, you say is one-sixteenth of an inch and come in the uveal tract and thereby bring about a loss of vision? A. Yes, sir."

Dr. Peter Cope White, who testified for petitioner and who had treated respondent during the months of June and July as stated aforesaid, testified as follows:

"Q. Do you know, at this time, Doctor, what caused this loss of vision? A. No, I could not say it was not the injury—I could not tell you what caused it."

Petitioner introduced testimony of Dr. L. E. Toney of West Plains, Mo., showing that respondent had been treated by him during the month of October, 1929, for sinus trouble. Dr. Toney testified, in substance, that respondent at that time was suffering from sphenoid-sinusitis; and was suffering from a 60 per cent. loss of vision in the right eye.

There is nothing in the record to show that this sinus infection had not cleared up. In fact, Dr. H. R. Hees, an eye, ear, nose and throat specialist, examined respondent after the testimony of Dr. Toney

was produced for the purpose of determining whether or not respondent was suffering from sphenoiditis or any other disease of the nose. He testified that the sinuses were clear. He testified as follows:

"Q. Did he have any sinus trouble of any nature that you were able to discover at this time which would tend to cause or contribute to the loss of vision? A. In my judgment, no * * * Q. Is there anything from your examination which would enable you to believe that this man had at any time in the past suffered from spenoid sinusitis? Was there anything there that you were able to account for which would cause you to believe that this claimant had at any time suffered from any such ailment such as sphenoid sinusitis? A. There is no evidence at present—of course, a person can have infection of the sinus and it clears up. * * * A. * * * I cannot conceive of the sinus being severe enough to account for the pathology that he has in the eye now. * * * Q. * * * What would you say caused his loss of vision? A. If the vision was normal prior to the injury and the inflammation subsequent was severe, I cannot only conclude that the injury was the cause of it."

Respondent denied that Dr. Toney had made any test of loss of vision to his eyes. It appears from the record that exhaustive medical expert testimony was given in reference as to whether or not the former sinus condition was attributable to the loss of vision to the eye. This evidence was conflicting. As we view the record, there is competent evidence to support the finding of the Commission that respondent suffered a permanent loss of vision to the right eye as result of original injury. The Commission is the trier of the facts.

As to the excessiveness of the award on the theory that respondent was not entitled to an award for permanent total disability due to contended former disability to the eye at the time respondent was treated by Dr. Toney, it is to be observed that respondent denied that Dr. Toney gave him any vision test in 1928. We are not concerned with the credibility of testimony. Respondent also testified that he worked for petitioners about 18 months preceding the accident; that prior thereto he had worked for another oil company and had submitted himself for an examination on two different occasions; that he had no difficulty in performing regular work of a roustabout of petitioner; that prior to the injury he had not had any trouble with his eyes; that he had never been examined

for glasses; and that since he was discharged by Drs. White and White, he noticed a difference in his sight from that which existed prior to his injury.

We are of the opinion that the award should be, and the same is hereby, affirmed.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, ANDREWS, OSBORN, BUSBY, and WELCH, JJ., concur.

BAYLESS, J., absent.